**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>Information associated with ▮▮▮▮▮▮▮ that is stored at premises controlled by Google LLC | Case No. **MC 2 1   0 0 0 2 6**<br><br>**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT** |

I, David West, being first duly sworn, do hereby state as follows:

**INTRODUCTION**

1.    I am a Special Agent (SA) employed with U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) and have so been employed since September 2018.  I am assigned to the HSI Saipan office in the Commonwealth of the Northern Mariana Islands (CNMI).  Prior to joining HSI, I worked as a Patrol Agent with the United States Border Patrol for over ten years.

2.    I have attended and graduated from the Border Patrol Academy in 2008, as well as the Criminal Investigator Training Program, and the HSI Special Agent Training Academy held at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have received extensive classroom and on the job training in the areas of general law enforcement, criminal investigative techniques, interviews and interrogations, general and electronic surveillance, criminal and constitutional law covering federal search and seizure statutes, the execution of search warrants,

and interviewing both suspect and victims of crimes, among others. Additionally, during my law enforcement career, I have received training in the investigation and enforcement of both administrative and criminal statutes related to the U.S. Immigration and Nationality Act (INA).

3.    My duties as an HSI SA include investigating violations of Federal laws pursuant to Titles 8, 18, 19, 21, 31 and others. These Titles collectively encompass a wide range of Federal statutes such as harboring aliens, smuggling, financial and commercial investigations, materially false statements made to a federal agency, immigration benefit and/or identity fraud, passport application fraud, bank fraud, mail fraud, wire fraud, narcotics and contraband smuggling and distribution, conspiracies to defraud the United States and other violations.

4.    As a law enforcement officer, I have been involved in the use of physical surveillance of individuals or premises, review and inspection of official documents and other records, and other investigative techniques. I have controlled, directly assisted, and participated in the execution of numerous federal and State arrest and search warrants, searches of people, residences, and property of people, suspected of criminal violations of law; and have interviewed numerous individuals who were suspected of, or admitted to violations of law.   Here now, I am assisting the lead case agent in an HSI Saipan investigation of a business operating on Saipan called A & A ENTERPRISE CNMI, LLC. (hereinafter A&A ENTERPRISE).

5.    I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises controlled by Google LLC, an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google LLC to disclose to the

government copies of the information (including the content of communications) further described in Section I of Attachment B.

6.     Based on my training and experience and facts set forth in this affidavit, there is probable cause to believe personnel associated with A&A ENTERPRISE, namely Alejandro Tumando NARIO (hereinafter "NARIO"), an officer of the business, and Mylene CASUPANAN (hereinafter "CASUPANAN"), an employee of the business, and ███████████ (hereinafter "██████"), an accountant employed by ████████████████ (hereinafter "████████"), committed violations of Title 18 U.S. Code § 1546, Fraud and Misuse of Visas, Title 18 U.S.C. § 1341, Mail Fraud, and Title 18 U.S.C. § 371, Conspiracy to Defraud the United States.  Evidence to be searched for and seized during the search is more particularly described in the following paragraphs and in Attachment B.  Because this affidavit is being submitted for the limited purpose of securing a search and seizure warrant, I have not included each fact known to me concerning this investigation.

## ELEMENTS OF THE OFFENSES

7.     Title 18 U.S.C. § 1546(a) makes it a Federal crime to knowingly make a materially false statement to a U.S. immigration agency under oath or penalty of perjury on an application required by immigration laws or regulations.  According to Ninth Circuit Model Jury Instruction No. 8.134, the pertinent elements of a violation of Title 18 U.S.C. § 1546(a) are as follows:

a.  First, the defendant made, or subscribed as true, a false statement;

b.  Second, the defendant acted with knowledge that the statement was untrue;

c.  Third, the statement was material to the activities or decisions of the U.S. Citizenship and Immigration Services (USCIS) agency, in that it had a natural tendency to influence, or was capable of influencing, USCIS's decisions or activities;

3

d.  Fourth, the statement was made under oath or penalty of perjury; and

e.  Fifth, the statement was made on an application, affidavit, or other document required by immigration laws or regulations.

8.  According to Ninth Circuit Model Jury Instruction No. 8.121, the pertinent elements of a violation of Title 18 U.S.C. § 1341 are as follows:

a.  First, the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

b.  Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

c.  Third, the defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

d.  Fourth, the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

9.  According to the Ninth Circuit Model Jury Instruction No. 8.21, the pertinent elements of a violation of 18 U.S.C. § 371 are as follows:

a.  First, there was an agreement between two or more persons to defraud the United States by obstructing the lawful functions of USCIS by deceitful or dishonest means as charged in the indictment;

b.  Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c.  Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with all of you agreeing on a particular overt act that you find was committed.

## JURISDICTION

10.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the District of the Northern Mariana Islands is "a district court of the

1  United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. §

2  2711(3)(A)(i).

3  ## SUMMARY OF INVESTIGATION

4       11.     During 2020, HSI learned of a scheme where A&A ENTERPRISE, located in the

5  Commonwealth of Northern Mariana Islands (CNMI), petitioned for CW-1 visas for applicants

6  located in the Republic of the Philippines.  These applicants were promised employment in the

7  CNMI and were required to pay a fee for their recruitment, which includes the petition fee for the

8  CW-1 visa.  Upon their arrival in the CNMI, these foreign nationals were told that there was no

9  work for them and/or instructed to find employment elsewhere.  A number of these non-working

10  employees were instructed to pay employment taxes even though they are not receiving any

11  wages, thus falsely representing a full-time employer-employee relationship.  HSI has conducted

12  several interviews with foreign nationals that have provided information on the scheme.

13  Furthermore, a database search of CW-1 petitions for A&A ENTERPRISE revealed that

14  numerous petitions were submitted to USCIS for adjudication, for approximately 198 CW-1

15  workers in FY 2019 and FY 2020.

16       12.     Based on my training, experience, and prior discussions with other experienced

17  law enforcement officials within HSI, I am aware that it is generally common practice for

18  businesses to generate and keep records pertaining to clients, vendors, payments, banking and

19  financial transactions, taxes, and employees.  These records generally include (but are not limited

20  to) draft and executed contracts, purchase orders, agreements, employee personnel files,

21  invoices, payments made and received, accounts payable and receivable, accounting and payroll

22  ledgers, transaction receipts and duplicates, business checks, and official correspondence to

23

24

include electronic mail (email).  A&A ENTERPRISE frequently utilized email for routine daily business.

## PROBABLE CAUSE

13.     During the course of this investigation, I and other HSI law enforcement officials have reviewed numerous CW-1 visa application packets submitted by A&A ENTERPRISE to USCIS.  Most of the A&A ENTERPRISE petitions were signed by NARIO.  The visa packets submitted by A&A ENTERPRISE included numerous documents and records in support of CW-1 visas for prospective employees of A&A ENTERPRISE.  Many of these prospective employees are citizens and nationals of the Republic of the Philippines, People's Republic of Bangladesh, and the People's Republic of China.

14.     These CW-1 visa packets included I-129 CW Petitions for CNMI-Only Nonimmigrant Transitional Worker application forms, copies of service agreements or contracts between A&A ENTERPRISE and several business entities in Saipan, copies of identification documents, clearances, and employment contracts between A&A ENTERPRISE and the employees being petitioned.  These packets also included copies of correspondence between USCIS and A&A ENTERPRISE, copies of tax documents and bank account statements for A&A ENTERPRISE, copies of non-discrimination and worker's compensation policies, and public announcement of positions in CNMI newspapers.

15.     On September 29, 2020, HSI interviewed Individual 1, a citizen of the Republic of the Philippines, at the HSI Saipan office.  Individual 1 stated that while he/she resided in the Philippines he/she became aware of A&A ENTERPRISE from a friend residing in Saipan. Individual 1 stated that his/her friend paid CASUPANAN, an employee of A&A ENTERPRISE, $660.00 United States Dollars (USD) for Individual 1's CW-1 petition.  In addition, Individual 1

obtained a loan for 56,000.00 Php (Philippine Peso), approximately $1,155.77 USD, in the Philippines to pay for a portion of the CW-1 fees he/she was charged.

16.     After receiving an approved CW-1 visa, Individual 1 travelled to the United States on February 22, 2020, and was admitted at the Guam International Airport and later travelled to Saipan.  Since arriving in Saipan, Individual 1 stated that he/she has never worked for A&A ENTERPRISE and was told there was no work available because of the COVID lockdown.  A&A ENTERPRISE told Individual 1 that they would contact him/her when work would become available.

17.     On or about March 4, 2020, Individual 1 went to A&A ENTERPRISE and paid four hundred $400 USD to ███████████ (hereinafter "████"), the secretary at A&A ENTERPRISE, for the renewal of his/her CW-1 visa.  Individual 1 also signed an A&A ENTERPRISE employment contract, which was similar to the contract he/she previously signed in the Philippines.

18.     Individual 1 stated that when he/she makes payments, usually ████ collects the money at A&A ENTERPRISE's office.  ████ creates a receipt every time Individual 1 makes an employment fee payment, from the same receipt book, and gives a copy of the receipt to him/her.  Individual 1 recalled that ████ normally keeps the receipt book on the top of ██ desk.  The last time Individual 1 received a receipt from A&A ENTERPRISE was on June 15, 2020.

19.     Individual 1 provided HSI with seven (7) A&A ENTERPRISE receipts for a total of $3,089.26 USD made at various times from November 12, 2019, to June 15, 2020, for the CW-1 processing fee and payments.  It was noted that all receipts were handwritten on a serialized custom receipt believed to have originated from a tear-off receipt book.

7

20.     On September 29, 2020, HSI interviewed Individual 2, a citizen of the Republic of the Philippines, at the HSI office.  Individual 2 stated that on February 22, 2020, he/she arrived at Guam and subsequently travelled to Saipan.  Individual 2 was admitted to the United States utilizing a CW-1 visa, which was petitioned by A&A ENTERPRISE.  Since arriving in Saipan, Individual 2 was told by A&A ENTERPRISE that they would contact him/her when work would be available.

21.     During March 2020, Individual 2 worked at a gas station for sixteen (16) hours at a rate of seven dollars and thirty-five cents ($7.35) per hour.  This job was arranged by A&A ENTERPRISE and he/she was paid in cash by CASUPANAN.  Aside from this brief employment, Individual 2 has not been provided with regular work from A&A ENTERPRISE.

22.     According to Individual 2, he/she borrowed money from a relative to pay $2,000 USD to A&A ENTERPRISE for the CW-1 visa.   Individual 2 stated that his/her relative resided in Saipan and paid $2,000 USD to A&A ENTERPRISE.

23.     According to Individual 2, CASUPANAN told him/her that he/she must pay taxes for the seventy (70) hours of "work" at A&A ENTERPRISE and if he/she doesn't, they would cancel his/her CW-1 visa.  Therefore, Individual 2 pays CASUPANAN at A&A ENTERPRISE $194 USD every two (2) weeks for taxes, even though he/she is not earning any wages. Individual 2 stated that CASUPANAN provides him/her with a receipt for each payment.

24.     Individual 2 stated that ▮▮▮ is CASUPANAN's assistant at A&A ENTERPRISE and NARIO is the owner of A&A ENTERPRISE, which is located in Gualo Rai village on the Island of Saipan.  Based on his/her interactions with ▮▮▮ and NARIO, Individual 2 believes that they are aware of the taxes that he/she is paying to CASUPANAN.

8

25.     During the interview, Individual 2 provided two (2) A&A ENTERPRISE receipts for a total of $1,074.16 USD.  The two (2) receipts were dated June 1, 2020, and June 15, 2020, for CW-1 processing fee payments.  Both receipts were handwritten on a serialized custom receipt and is believed to have originated from a tear-off receipt book.

26.     Additionally, Individual 2 provided HSI with twelve (12) A&A ENTERPRISE service receipts that appear to have been generated and printed on a computer using word processing software, with receipt numbers, date, customer name, job description, name of worker, pay period, hours, rate earned, and total amount for the months of June 2020 and September 2020.

27.     On October 22, 2020, at the direction of HSI, Individual 1 and Individual 2 met with the staff at A&A ENTERPRISE for the purpose of obtaining information about the "taxes" being paid to A&A ENTERPRISE.  Individual 1 and Individual 2's conversation was monitored and recorded during this meeting at A&A ENTERPRSE's office.   At the conclusion of the meeting, Individual 1 and Individual 2 were separately interviewed by HSI personnel.

28.     According to Individual 1, NARIO and CASUPANAN were present in the office when he/she asked about the consultation letter he/she received from A&A ENTERPRISE. NARIO told Individual 1 that he/she has not been paying the employment fee.  NARIO told Individual 1 that if he/she does not pay the employment fee, i.e. taxes, then they will cancel his/her CW-1 visa.  However, if Individual 1 continues to pay his/her employment fee, A&A ENTERPRISE will not cancel his/her CW-1 visa.

29.     CASUPANAN told Individual 1 that the employment fee was $194 USD and must be paid every two weeks.  CASUPANAN explained that the employment fee of $194 USD is the payment for the taxes, rental, and the salary of the employees at A&A ENTERPRISE.

NARIO and CASUPANAN explained to Individual 1 it was not their responsibility to find him/her work because it was his/her friend and Individual 2's relative that asked A&A ENTERPRISE for help with obtaining CW-1 visas for them. Therefore, they petitioned for Individual 1 and Individual 2's CW-1 visas and that A&A ENTERPRISE is not responsible for finding work for them.

30.     During a separate interview, Individual 2 informed HSI that NARIO and CASUPANAN were present when they entered A&A ENTERPRISE. Individual 2 stated that CASUPANAN opened the front door and he/she observed computers and file cabinets at A&A ENTERPRISE's office.

31.     On October 26, 2020, HSI Special Agent (SA) Michael Lansangan reviewed the recordings between Individual 1, Individual 2, NARIO and CASUPANAN. In summary, SA Lansangan noted that it contained discussions referencing past arrangements between Individual 2's relative and A&A ENTERPRISE to bring Individual 2 to Saipan. The conversation between Individual 1, Individual 2, NARIO and CASUPANAN refers to an agreement with Individual 1's friend, which Individual 1 is now attempting to change. NARIO told Individual 1 the reason A&A ENTERPRISE processed the CW-1 petition was because the friend had requested that A&A ENTERPRISE do it for him/her and they had no reason to hire Individual 1 if the friend did not request it. NARIO told Individual 1 because the friend had asked them to bring him/her to Saipan then the friend should find him/her work.

32.     During their conversation, they told Individual 1 that A&A ENTERPRISE has given Individual 1 and Individual 2 many opportunities to find work since their arrival and that A&A ENTERPRISE cannot help because they will get caught. NARIO told Individual 1 that he/she is to find his/her own way to earn his/her contribution to the agency, i.e. A&A

1    ENTERPRISE.  Furthermore, NARIO told Individual 1 that "it is not just you, there are many

2    others who already entered that are in the same situation, but they fulfill their obligation."

3    NARIO told them, if Individual 1 and Individual 2 do not have work, A&A ENTERPRISE will

4    cancel their CW-1.

5        33.    On February 8, 2021, HSI reviewed the CW-1 petition that was submitted by

6    A&A ENTERPRISE for Individual 1 and Individual 2, Receipt Number:             ,

7    which appeared to be signed by NARIO and listed the company's email as

8                            The petition was approved on December 13, 2019, by USCIS

9    for the period of December 13, 2019, to September 30, 2020, and listed the U.S. Consulate as

10   Manila.  The petition contained two (2) employment contracts for Individual 1 and Individual 2

11   to be employed by A&A ENTERPRISE, in the job classification of "maid and housekeeping"

12   from the period of November 20, 2019, until September 30, 2020, for a total of thirty-five (35)

13   hours per week.

14       34.    The petition also contained two (2) service contract agreements with A&A

15   ENTERPRISE and Individual 3; A&A ENTERPRISE and Individual 4 to employ Individual 1

16   and Individual 2, respectively.  The service contract agreement was for Individual 3 and

17   Individual 4 to employ Individual 1 and Individual 2 from A&A ENTERPRISE in the job

18   classification of "maid and housekeeping" from period of November 20, 2019, until September

19   30, 2020, for a total of thirty-five (35) hours per week.  Both service contract agreements were

20   signed by Individual 3, Individual 4 and NARIO.

21       35.    On November 18, 2020, the friend of Individual 1, a citizen of the Republic of the

22   Philippines, was interviewed by HSI at the HSI office.  During the interview, the friend stated

23   that he/she asked CASUPANAN for help with obtaining a CW-1 visa for Individual 1.  It was

24

11

agreed that the friend would pay for all expenses and fees, he/she therefore paid about $2,200 to $2,300 USD in cash installments for Individual 1's CW-1. The friend was told by CASUPANAN to find someone that can pose as a second party employer for Individual 1. The friend stated that Individual 4, his/her friend, might be willing to sign and CASUPANAN provided him/her with the service contract.

36.    The friend took the service contract to Individual 4. At first Individual 4 did not want to sign the document but agreed after he/she spoke with someone from A&A ENTERPRISE. The friend told Individual 4 that the service contract was only going to be used to file for the CW-1 and that the employee-employer relationship would not be real. After he/she signed the contract, the friend took it to CASUPANAN at A&A ENTERPRISE.

37.    On December 1, 2020, HSI interviewed Individual 4, a citizen of the Republic of the Philippines, at the HSI office. During the interview, Individual 4 was presented with a service contract between A&A ENTERPRISE and Individual 4. After reviewing the document, Individual 4 stated the signature was his/hers and that he/she had received this document from the relative, his/her friend, and signed it as a favor. Individual 4 stated that he/she has never employed Individual 1 and that he/she does not know NARIO or the company A&A ENTERPRISE.

38.    This Court issued a search warrant on April 6, 2021, ordering Google LLC to disclose communications associated with ▮▮▮▮▮▮▮▮▮▮▮ Investigation of that search warrant result determined CASUPANAN exchanged multiple emails with ▮▮▮▮ pertaining to a request by ▮▮▮▮, via ▮▮▮▮, for A &A ENTERPRISE to obtain CW-1 visa petitions for four persons, including ▮▮▮▮▮ and ▮▮▮▮ ▮▮▮▮. ▮▮▮▮ utilized the email address ▮▮▮▮▮▮▮▮ for this

1 | communication.  The CW-1 petitions for ███████ and ███████ each contained fabricated

2 | employment contracts between A&A ENTERPRISE and Tropical Cleaning Services, a company

3 | in Saipan.  Tropical Cleaning Services confirmed to HSI it never entered into an agreement with

4 | A&A ENTERPRISE for employment of ███████ and ███████.

5 |
### BACKGROUND CONCERNING EMAIL

6 | 39.     In my training and experience, I have learned that Google LLC provides a variety

7 | of on-line services, including electronic mail ("email") access, to the public.  Google LLC allows

8 | subscribers to obtain email accounts at the domain name gmail.com, like the email accounts

9 | listed in Attachment A.  Subscribers obtain an account by registering with Google LLC.  During

10 | the registration process, Google LLC asks subscribers to provide basic personal information.

11 | Therefore, the computers of Google LLC are likely to contain stored electronic communications

12 | (including retrieved and unretrieved email for Google LLC subscribers) and information

13 | concerning subscribers and their use of Google LLC services, such as account access

14 | information, email transaction information, and account application information.  In my training

15 | and experience, such information may constitute evidence of the crimes under investigation

16 | because the information can be used to identify the account's user or users.

17 | 40.     In general, an email that is sent to a Google LLC subscriber is stored in the

18 | subscriber's "mailbox" on Google LLC servers until the subscriber deletes the email.  If the

19 | subscriber does not delete the message, the message can remain on Google LLC servers

20 | indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Google

21 | LLC's servers for a certain period.

22 |
### SEARCH PROCEDURE

23 | 41.     Upon receipt of the information described in Section I of Attachment B,

24 |

government-authorized persons who do not have a role in the investigation will review that

information to locate the items described in Section II of Attachment B.  Once the Government

seizes the items set forth in Section II of Attachment B, the information provided by Google

LLC will be sealed and retained for authenticity and chain of custody purposes and data falling

outside the scope of the items to be seized under Section II of Attachment B will not be accessed

absent further order of the Court.

**CONCLUSION**

42.     Based on the forgoing, I request the Court issue the proposed search warrant.

Because the warrant will be served on Google LLC, who will then compile the requested records

at a time convenient to it, reasonable cause exists to permit the execution of the requested

warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law

enforcement officer is not required for the service or execution of this warrant.  I have shown this

affidavit and the accompanying search warrant application to Assistant United States Attorney

Albert S. Flores, Jr., and he informs me that they are in proper form.

Respectfully submitted,

David West, Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on June __7__, 2021.

ROBERT C. NARAJA
Designated Judge  TERESA KIM-TENORIO

14

1

## ATTACHMENT A

2

### Property to Be Searched

3       This warrant applies to information associated with ▓▓▓▓▓▓▓▓▓ that

4   is stored at premises owned, maintained, controlled, or operated by Google LLC, a company

5   headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by Google LLC**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google LLC, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google LLC, Google LLC is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account beginning January 1, 2019, through June 6, 2021, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address(es) used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

16

e.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within fourteen (14) days of service of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities relating to violations of 18 U.S.C § 1546 Fraud and Misuse of Visas, 18 U.S.C. § 1341 Mail Fraud, and 18 U.S.C. § 371 Conspiracy to Defraud the United States, specifically those violations occurring on or after January 1, 2019, and involving Mylene CASUPANAN, Alejandro Tumando NARIO, and ████████████, other past or present employee or officer of A & A ENTERPRISE CNMI, LLC., ████████████, or any other business operating under A & A ENTERPRISE CNMI, LLC., including, but not limited to:

a.    Any and all communications or messages relating to immigration and employment of foreign workers, including I-129CW petitions and all supporting documents or information submitted by A&A ENTERPRISE on behalf of CW-1 beneficiaries;

b.    Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner; and

c.    Evidence indicating the identity of the person(s) who created or used the user ID.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by **Google LLC**, and my official title is _____.  I am a custodian of records for **Google LLC**. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of **Google LLC**, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes).  I further state that:

    a.  all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.  such records were kept in the ordinary course of a regularly conducted business activity of **Google LLC**; and

    c.  such records were made by **Google LLC** as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____
Date    Signature

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.     Information to be disclosed by Google LLC**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google LLC, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google LLC, Google LLC is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all emails associated with the account beginning January 1, 2019, through June 6, 2021, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address(es) used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     The types of service utilized;

d.     All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

16

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within fourteen (14) days of service of this warrant.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities relating to violations of 18 U.S.C § 1546 Fraud and Misuse of Visas, 18 U.S.C. § 1341 Mail Fraud, and 18 U.S.C. § 371 Conspiracy to Defraud the United States, specifically those violations occurring on or after January 1, 2019, and involving Mylene CASUPANAN, Alejandro Tumando NARIO, and ▮▮▮▮▮▮▮▮, other past or present employee or officer of A & A ENTERPRISE CNMI, LLC., ▮▮▮▮▮▮▮▮, or any other business operating under A & A ENTERPRISE CNMI, LLC., including, but not limited to:

a.      Any and all communications or messages relating to immigration and employment of foreign workers, including I-129CW petitions and all supporting documents or information submitted by A&A ENTERPRISE on behalf of CW-1 beneficiaries;

b.      Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner; and

c.      Evidence indicating the identity of the person(s) who created or used the user ID.

17

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS
## PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by **Google LLC**, and my official title is _____. I am a custodian of records for **Google LLC**. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of **Google LLC**, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.  all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.  such records were kept in the ordinary course of a regularly conducted business activity of **Google LLC**; and

    c.  such records were made by **Google LLC** as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____
Date    Signature

18